

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DAVID H. MARKIN, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 07 C 0497 |
| | ) | |
| v. | ) | Magistrate Judge |
| | ) | Martin C. Ashman |
| CHEBEMMA, INC., MARK HUNT, | ) | |
| DIVISION STATE, LLC, and | ) | |
| JOHN TERZAKIS, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

David H. Markin ("Plaintiff") sued Chebemma, Inc. ("Chebemma"), Mark Hunt ("Hunt"), Division State, LLC ("Division State"), and John Terzakis ("Terzakis") on counts of conspiracy to defraud, aiding and abetting fraud and breach of fiduciary duty, wrongful distribution, breach of a promissory note, and breach of a settlement agreement. Currently before this Court is Chebemma's Motion to Dismiss Plaintiff's Amended Complaint ("Chebemma's Motion" or "Motion"). The parties consented to have this Court conduct any and all proceedings in this case, including the entry of final judgment. 28 U.S.C. § 636(c); N.D. Ill. R. 73.1. For the reasons stated below, the Court denies Chebemma's Motion.

## I. Background[1]

In September 1999, Plaintiff—a resident and citizen of Palm Beach, Florida—entered into a joint venture with Terzakis. (Second Amend. Compl. ("Compl.") ¶ 9.) The joint venture included the purchase and development of 1163–67 North State Street, Chicago, Illinois, on which stood an unfinished, vacant, two-story commercial building ("the Property"). (*Id.*) The Property was held in a land trust by Parkway Bank and Trust Company ("the Land Trust"), in which Plaintiff and Terzakis owned a beneficial interest. (*Id.* at ¶ 10.)

With the Property vacant in 2003, Plaintiff and Terzakis sought to sell it. (*Id.* at ¶ 11.) To that end, they negotiated with Hunt, who is a Chicago-based real estate developer. (*Id.*) In May of that same year, Hunt—through an entity he owned and controlled, M Development, LLC ("M Development")—Plaintiff, and Terzakis agreed that M Development would buy the Property for $6,743,000.00 ("May Purchase Agreement"). (*Id.* at ¶ 12.) Payment of that amount would take place in four parts. First, M Development would pay $50,000.00 in earnest money to Plaintiff. (*Id.*, Ex. A at 2.) Second, M Development would execute a $1,660,000.00 promissory note payable to Plaintiff, who would receive the amount, plus interest, within two years. (*Id.* at ¶ 12.) Third, M Development would provide $1,000,000.00 (less the earnest money) at closing. (*Id.*) Finally, the balance of the of the purchase price could be satisfied in a variety of ways, one of which was by M Development assuming the sellers' mortgage. (*Id.*, Ex. A at 3–4.)

Three months later, in August 2003, Terzakis informed Plaintiff's attorney, Wayne R. Hannah, Jr., that Hunt would not proceed with the sale because Hunt felt that the terms of the

---

[1] Since only three of the five counts in the complaint are at issue in this Motion, the Court omits unnecessary facts relating to the two uncontested counts.

May Purchase Agreement excessively favored Plaintiff and Terzakis.[2] (*Id.* at ¶ 13.) Sometime between then and September 24, 2003, Terzakis and Hunt orally agreed, "for the purpose of accomplishing by concerted action through unlawful means, the transfer of Plaintiff's beneficial interest in the Property to Terzakis for terms that Plaintiff would not otherwise have accepted if he had known the existence of" the conspiracy between Terzakis and Hunt. (*Id.* at ¶ 14.)

Plaintiff alleged that to accomplish this conspiracy, Hunt and Terzakis created Chebemma, and Terzakis intentionally represented to Plaintiff that Hunt controlled and owned one hundred percent of the corporation. (*Id.* at ¶ 15(b).) But it was Terzakis, not Hunt, who solely owned or controlled Chebemma. (*Id.*) To give the appearance that Hunt owned Chebemma, Terzakis and Hunt then anointed Hunt as Chebemma's President, Secretary, and Treasurer. (*Id.* at ¶ 15(c).) At this point, Terzakis told Plaintiff that, if he wanted to sell the property to Chebemma, he would have to agree to terms different from, and less favorable than, those of the May Purchase Agreement. (*Id.* at ¶ 15(d).) Then, on September 24, 2003, Hunt executed an agreement—signing it as Chebemma's president to deceive Plaintiff—to sell the beneficial interest in the Property to Chebemma ("September Purchase Agreement") "on terms that were substantially less favorable to [Plaintiff]." (*Id.* at ¶ 15(e).) Under this Agreement, Plaintiff accepted less money at the time of closing and assumed more risk of future-payment failure under a promissory note that the Agreement required ("the Note"). (*Id.* at ¶ 17.) Plaintiff, relying on the representations made, signed the September Purchase Agreement. (*Id.* at ¶ 16.) During this

---

[2] Neither party explains whether the May Purchase Agreement was an enforceable contract and, if so, whether Plaintiff ever attempted to enforce it.

- 3 -

time, neither Terzakis nor Hunt disclosed to Plaintiff that Terzakis owned all or part of Chebemma. (*Id.* at ¶ 18.)

After Hunt and Plaintiff signed the September Purchase Agreement, they executed four amendments that extended the closing date for Chebemma's benefit. (*Id.* at ¶ 18.) Then, in mid-August 2004, the sale occurred. (*Id.* at ¶ 19.) Thereafter, Chebemma delivered the Note for $2,385,00.00 (plus interest), as required under the September Purchase Agreement, which Hunt signed on Chebemma's behalf. (*Id.* at ¶ 19; *Id.* at Ex. C.) As part of the agreement, Plaintiff and Terzakis transferred their interests in the Land Trust to Chebemma. (*Id.* at ¶ 20.)

During the period following the sale—from August 2004 to September 2006—Chebemma paid to Plaintiff quarterly interest payments under the Note, each in the amount of approximately $13,000.00. (*Id.* at ¶ 21.) In September 2006, the total amount on the Note came due. (*Id.* at ¶ 22.) Chebemma failed to pay the amount then owing, $2,569,973.00, representing the principal amount ($2,385,000.00), plus the interest owed ($303,773.00) less the interest paid ($118,800.00). (*Id.* at ¶ 60.) A few months later, on January 25, 2007, Plaintiff sued Chebemma in this Court for breach of the Note.

Despite the lawsuit, Plaintiff alleges that Hunt allowed himself to be represented as Chebemma's owner—even participating in settlement discussions as Chebemma's owner—until Plaintiff discovered the alleged fraud in which Hunt and Terzakis had engaged. (*Id.* at ¶ 24.) Shortly after a settlement conference, in June 2007, Hunt and Terzakis transferred the beneficial interest in the Property from Chebemma to Division State, an entity owned by Hunt. (*Id.* at ¶¶ 25, 44.) In so doing, they induced ATG Trust Company not to disclose the transfer to Plaintiff. (*Id.* at

¶ 25.) Chebemma received $4,900,000.00 from Division State for the sale of the beneficial interest in the Property. (*Id.* at ¶ 44.)

Plaintiff alleges that Hunt and Terzakis continued to attempt to hide their wrongdoing, allowing Hunt to appear on Chebemma's behalf at a court-supervised settlement conference on April 16, 2008. (*Id.* at ¶ 26.) While Hunt could not make the conference, his personal counsel and Chebemma's counsel appeared, though neither disclosed the aforementioned allegations, or the transfer of the Property from Chebemma to Division State. (*Id.* at ¶ 26.)

Additionally, Plaintiff alleges that Terkzakis and Hunt, directly or indirectly, made false representations to Plaintiff knowing or believing them to be false to induce Plaintiff to sell his beneficial interest (forty-nine percent) in the property on terms to which he otherwise wouldn't have agreed. (*Id.* at ¶ 27.) Plaintiff also alleges he relied on these misrepresentations to his detriment, suffering damages in the amount of $2,000,000.00. (*Id.* at ¶¶ 28–29.) Additionally, Plaintiff alleges that Division State accepted property knowing of the fraud and is now a constructive trustee of Plaintiff's forty-nine percent interest in the Property. (*Id.* at ¶¶ 31–32.)

Because Chebemma owed Plaintiff a fiduciary duty not to render itself insolvent through the distribution of its assets, Plaintiff contends that Terzakis' sale of the beneficial interest in the Property breached this duty, and this willful and wanton conduct injured Plaintiff. (*Id.* at ¶¶ 47–49, 52–53.) Those funds, Plaintiff contends, should have been held in trust for the benefit of Chebemma's creditors. (*Id.* at ¶ 49.) Alternatively, Plaintiff claims that the Illinois Business Corporation Act applies if Chebemma was not insolvent at the time of transfer. (*Id.* at ¶ 50.) Plaintiff's five-count complaint alleges claims labeled conspiracy to defraud (Count I), aiding and abetting fraud and breach of fiduciary duty (Count II), wrongful distribution (Count III), breach

of a promissory note (Count IV), and breach of a settlement agreement (Count V). Chebemma has moved to dismiss Counts I, III, and IV.

## II. Standards on a Motion to Dismiss

### A. Rule 8(b)

Under Federal Rule of Civil Procedure 8 ("Rule 8"), the plaintiff must file a complaint containing a short plain statement showing why the plaintiff is entitled to relief. FED. R. CIV. P. 8(a). A motion to dismiss tests the legal sufficiency of the complaint, not the merits of the claim. *Weiler v. Household Fin. Corp.*, 101 F.3d 519, 524 n.1 (7th Cir. 1996). As this Court has noted, the Supreme Court recently expounded upon the notice pleading standard articulated in *Conley v. Gibson*, 355 U.S. 41 (1957). *See Jones v. Bull Moose Tube* Co., 2009 WL 3483804, at *3 (N.D. Ill. Oct. 26, 2009) (discussing *Ashcroft v. Iqbal*, --- U.S. ----, 129 S.Ct. 1937 (2009) and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)). Nevertheless, the notice pleading standard remains in tact. *E.g.*, *Bissessur v. Ind. Univ. Bd. of Trs.*, 581 F.3d 599, 603 (7th Cir. 2009).

To state a claim under Rule 8, the plaintiff cannot merely plead bare legal conclusions; the plaintiff must allege factual grounds that entitle it to relief. *Iqbal*, 129 S.Ct. at 1949. This standard is met if "[t]he complaint . . . contain[s] 'enough facts to state a claim to relief that is plausible on its face,' and . . . state[s] sufficient facts to raise a plaintiff's right to relief above the speculative level." *Bissessur*, 581 F.3d at 602 (quoting *Twombly*, 550 U.S. at 570). That is, the plaintiff must state a "plausible claim for relief." *Iqbal*, 129 S.Ct. at 1950. A claim is plausible if the factual grounds pled permit a court to reasonably infer that the defendant is liable under the

- 6 -

plaintiff's theory beyond some speculative level. *In re marchFIRST Inc.*, 589 F.3d 901, 905 (7th Cir. 2009); *Bissessur*, 581 F.3d at 602. The Court undertakes this context-specific inquiry, drawing on its experience and common sense for guidance. *Cooney v. Rossiter*, 583 F.3d 967, 971 (7th Cir. 2009) (quoting *Iqbal*, 129 S.Ct. at 1950).

Additionally, to pass this test, "[c]omplaints need not anticipate or attempt to defuse potential defenses." *U.S. Gypsum Co. v. Ind. Gas Co., Inc.*, 350 F.3d 623, 626 (7th Cir. 2003) (citing *Gomez v. Toledo*, 446 U.S. 635 (1980)); *Massey v. Merrill Lynch & Co., Inc.*, 464 F.3d 642, 650 (7th Cir. 2006). In other words, complaints do not need to overcome defenses to survive a motion to dismiss—they merely must meet the notice pleading standard. *U.S. Gypsum*, 350 F.3d at 626. That said, "a party may plead itself out of court by pleading facts that establish an impenetrable defense to its claims." *Tamayo v. Blagojevich*, 526 F.3d 1074, 1086 (7th Cir. 2008) (citing *Massey*, 464 F.3d at 650). Thus, "[a] plaintiff 'pleads himself out of court when it would be necessary to contradict the complaint in order to prevail on the merits.'" *Id.* (quoting *Kolupa v. Roselle Park Dist.*, 438 F.3d 713, 715 (7th Cir. 2006)). Thus, "[i]f the plaintiff voluntarily provides unnecessary facts in her complaint, the defendant may use those facts to demonstrate that she is not entitled to relief." *Id.* This standard applies to the Court's analysis of Counts III and IV.

### B. Rule 9(b)

While Rule 8 governs pleadings generally, Federal Rule of Civil Procedure 9 ("Rule 9") sets forth a different pleading standard. In particular, Rule 9(b) states that parties "alleging fraud . . . must state with particularity the circumstances constituting fraud or mistake. Malice,

intent, knowledge, and other conditions of a person's mind may be alleged generally."

FED. R. CIV. P. 9(b). Although Rule 9(b) doesn't require the plaintiff to plead actual evidence, it does require pleading "with particularity the who, when[,] and how of the alleged frauds." *Windy City Metal Fabricators v. CIT Tech. Fin. Servs.*, 536 F.3d 663, 669 (7th Cir. 2008). This standard applies to the Court's analysis of Count I.

### III. Discussion

#### A. Documents Considered

The threshold issue is whether the Court may consider a subordination agreement signed on August 11, 2004 ("Subordination Agreement"), and attached to Chebemma's Motion, without converting the Motion into one for summary judgment. (Def.'s Mem. in Supp. of its Mot. To Dismiss ("Def.'s Mem.") 3.) The Subordination Agreement relates to sale of the beneficial interest in the Property from Plaintiff to Chebemma. (*Id.*) Under the Subordination Agreement, Plaintiff acted as junior lender, National City Bank as senior lender, and Chebemma as borrower. (*Id.*) Chebemma argues that the parties executed the Subordination Agreement "in connection with the purchase of the Property[,] and [it was] the principal financing obtained from National City to facilitate that purchase." (Def.'s Mem. 3.)

While a court normally cannot consider documents outside the complaint without converting it into a motion for summary judgment, FED. R. CIV. P. 12(d), a narrow exception exists: the court can consider documents attached to a motion to dismiss if the document is part of the pleadings that are referred to in the plaintiff's complaint, are central to his claim, and are properly authenticated (or authenticity is conceded). *E.g.*, *Hecker v. Deere & Co.*, 556 F.3d 575,

582 (7th Cir. 2009); *Tierney v. Vahle*, 304 F.3d 734, 738–39 (7th Cir. 2002); *Wright v. Associated Ins. Cos. Inc.*, 29 F.3d 1244, 1248 (7th Cir. 1994).

The Seventh Circuit in *Wright* applied this narrow exception. 29 F.3d at 1248. There, the plaintiff alleged, among other things, that he had been deprived of the property interest his employment contract guaranteed, and that the defendant tortiously interfered with his contractual relationship. 29 F.3d at 1247–48. The court decided whether it could properly consider the employment contract, which, although the plaintiff had not filed, the defendant had attached to its motion to dismiss along with an authenticating affidavit. *Id.* at 1248. The court found that the "reference" component of the exception was satisfied by the plaintiff repeatedly quoting and referencing the contract in his complaint. *Id.* The Court also found that the agreement was central to the claims of due process violation and tortious interference because those claims depended upon the existence of the employment contract. *Id.* Finally, the court noted that the document had been properly authenticated. *Id.* For those reasons, the *Wright* court held that the district court properly considered the contract when deciding the defendant's motion to dismiss. *Id.*

Here, unlike *Wright*, Plaintiff did not reference or quote the Subordination Agreement in his complaint, nor is the Subordination Agreement central to Plaintiff's claim. Chebemma argues that the Promissory Note on which Plaintiff sued "demonstrates that the parties contemplated executing a subsequent . . . Subordination Agreement." (Def.'s Reply 3.) Chebemma relies on *188 LLC v. Trinity Indus., Inc.*, 300 F.3d 730 (7th Cir. 2002), to support the argument that the Subordination Agreement should be considered by Court in deciding this motion to dismiss. (Def.'s Reply 3.) It's primary argument is that selective pleading should not be allowed to avoid a motion to dismiss. (*Id.*)

At first blush, Chebemma's argument seems plausible, but a closer look reveals its flaws. In *188 LLC*, the plaintiff filed a complaint alleging breach of contract, attaching two parts of the contract. 300 F.3d at 732–33. One of these documents stated, "Sales of all services and materials are subject to the general terms and conditions on the reverse side." *Id.* at 733. The parties fought over whether a particular document (Form 4)—which "contain[ed] a limitation of remedies provision that, were it part of the contract, would have barred relief"—constituted the terms on the reverse side. *Id.*

The district court granted the defendant's motion to dismiss the plaintiff's first amended complaint—which based a claim specifically on the exclusion of Form 4—without prejudice. *Id.* at 734. After the plaintiff filed a second amended complaint that did not attach Form 4, the defendant moved to dismiss it and attached Form 4 to its motion. *Id.* The district court granted that motion, finding that it could consider Form 4, which the court held was incorporated into the contract. *Id.*

On appeal, the Seventh Circuit noted that the "narrow exception" articulated in *Wright* exists "to prevent parties from surviving a motion to dismiss by artful pleading or failing to attach relevant documents." *Id.* at 735. It then went on to make the following holding:

> If Form 4 was indeed on the reverse side of the parties' contract or otherwise was incorporated into it, then Form 4 is relevant and was properly considered. [The defendant], by attaching Form 4 to its motion to dismiss, in effect alleged that [the plaintiff] had included with its complaint only those portions of the contract beneficial to [the plaintiff]. The district court needed to view Form 4 to understand the nature of the dispute between the parties. Consequently, the district court did not err in considering Form 4.

*Id.* at 735. The court first stated its conclusion conditionally: *if* the document in question is incorporated by reference, *then* it can be considered. So far, so good. But then the court abandoned that assertion, finding that the Form was properly considered by the district court because of what the defendant "alleged" by introducing Form 4; namely, that the plaintiff was selectively pleading documents to avoid dismissal. To properly understand the nature of the dispute, the district court needed to consider the document the defendant introduced. But that's the opposite of what the court said in the first sentence: the new document was relevant and properly considered *if* it was incorporated.

The court then explained that the district court erred in deciding that Form 4 was incorporated into contract and, therefore, could not rely on it to grant the defendant's motion. *Id.* at 736–39. Incorporation, the court found, involved factual issues that could not be resolved on a motion to dismiss. *Id.* In effect, the court excluded the document, even if it literally said quite the opposite.

Perhaps it is best, then, to read this holding in the context of the district court's decision, which found, not only that it could consider the new document, but that the new document was incorporated into the contract by reference. In that light, the Seventh Circuit's conditional holding still stands: the district court did not err per se because it found that new document was incorporated and, therefore, an essential part of the contract. Thus, the district court properly considered the document *in light of its finding of incorporation*. But since the district court's finding of incorporation was in error, the document could not be used to bar the plaintiff's claims.

Applied to this case, *188 LLC* militates in favor of, not against, Plaintiff's position. The Purchase Agreement notes that the "Purchaser's obligations under the Promissory Note shall be

secured by a Junior mortgage," but does not reference a particular subordination agreement. (Compl., Ex. A at 3, ¶ 2©.) Like in *188 LLC*, here the issue is one of incorporation, and either way you slice it—the court can consider the Subordination Agreement or it can't—the effect is the same: the Subordination Agreement is meaningless. Because incorporation cannot be decided at the motion-to-dismiss stage, and because the effect of the Subordination Agreement depends on whether it was incorporated, the Court cannot consider it when deciding this Motion.[3]

### B. Counts I, III, and IV

Chebemma spends most of its Motion and Reply arguing that Counts I, III, and IV are preluded by the express terms of the Subordination Agreement. (Def.'s Mem. 3–6.) The Court, however, already has found that it cannot consider the Subordination Agreement, and even if it could, it would not be able to determine whether the Subordination Agreement applied because determining whether it was incorporated involves factual issues. Chebemma makes no arguments about the sufficiency of Count IV if the Subordination Agreement cannot be considered; therefore, the Court denies Chebemma's Motion as to Count IV. As to Counts I and III, however, Chebemma argues an alternate deficiency, so it cannot be disposed of so easily.

---

[3] In any case, the Subordination Agreement was entered into for the benefit of the Senior Lender, who is not a party to this case. Chebemma now seeks to use that agreement for its own benefit, claiming that Plaintiff cannot sue Chebemma because of the Senior Lender's protection. If others have rights under the Subordination Agreement, Chebemma has no standing to assert them.

### C. Count I

Chebemma argues that Count I—conspiracy to defraud—fails to meet the heightened pleading standard of Rule 9(b). As a preliminary matter, the parties, rightly, don't dispute that Rule 9(b) applies here, where the claim is "premised upon a course of fraudulent conduct." *Borsellino v. Goldman Sachs Group, Inc.*, 477 F.3d 502, 507 (7th Cir. 2007). In Illinois, civil conspiracy exists where (1) two or more individuals combine "(2) for the purpose of accomplishing[,] by some concerted action[,] either an unlawful purpose or a lawful purpose by unlawful means," and, (3) one of the conspirators commits "an overt tortious or unlawful act" in furtherance thereof. *Fritz v. Johnston*, 807 N.E.2d 461, 470 (Ill. 2004).

In this case, Plaintiff alleged that Terzakis and Hunt first concocted a deal to sell the Property, which Hunt eventually decided not to accept in August 2003. Then, between August 2003 and September 24, 2003, Hunt and Terzakis agreed to a scheme in which they would use Chebemma to induce Plaintiff to sell the Property on unfavorable terms—terms to which Plaintiff would not have agreed had he known to whom he was selling the Property. Plaintiff also states specific overt acts committed by Hunt and Terzakis in furtherance of accomplishing this unlawful purpose: creating Chebemma; Terzakis representing to Plaintiff that Hunt owned Chebemma; intentionally concealing the fact that Hunt owned Chebemma; misleading Plaintiff to believe that Hunt owned Chebemma; Terzakis falsely representing to Plaintiff that, to sell the Property to Hunt, he would have to accept terms materially different than those to which the parties first agreed in the May Purchase Agreement; and causing Plaintiff to sell the beneficial interest in the Property to Chebemma on less beneficial terms than the May Purchase Agreement.

The complaint also detailed the unfavorable terms of the September Purchase Agreement and the date of the sale. Additionally, the complaint alleges that the conspiracy to defraud continued throughout the litigation, citing instances where Terzakis and Hunt concealed information regarding Chebemma's owner. It also avers that, in June 2007, Terzakis and Hunt continued to represent that Hunt owned Chebemma when Chebemma transferred the beneficial interest in the Property to Division State.

These allegations are sufficient to meet the pleading standard of Rule 9(b). They allege with particularity the who, when, and how of the conspiracy. *Windy City*, 536 F.3d at 669. As far as Chebemma's claim that Plaintiff has not sufficiently plead facts as to Chebemma, it is wrong. Chebemma was the vehicle used to carry out the conspiracy. In any case, the facts mentioned bear on Chebemma because Terzakis allegedly owned the company and Hunt was its president. In other words, Markin and Hunt made Chebemma a co-conspirator by using it to facilitate the conspiracy. Therefore, Plaintiff pled his allegations with sufficient particularity to satisfy the elements of conspiracy to defraud.

### D. Count III

In Count III, Plaintiff asserts a claim for wrongful distribution. Chebemma argues that this claim fails because Plaintiff "erroneously intimates that Chebemma's sale to Division State was improper, ignoring the express and unqualified authorization contained in . . . the Note." (Def.'s Mem. 8.) In other words, Chebemma argues that, under the Note, it was not required to seek Plaintiff's consent to sell the beneficial interest in the Property. (*Id.* 8–9.) Chebemma is right that it didn't need Plaintiff's consent to make this sale. But that is irrelevant. Plaintiff is arguing

that Chebemma had a duty to its creditors not to render itself insolvent—a duty it breached when it wrongfully transferred all of its assets to Division State, rendering it insolvent. (Pl.'s Opp'n 13; Compl. ¶¶ 42–53.) Therefore, Chebemma's argument as to Count III fails.

## IV. Conclusion

Based on the foregoing, the Court denies Chebemma's Motion to Dismiss Counts I, III, and IV.

**ENTER ORDER:**

_____
**MARTIN C. ASHMAN**
United States Magistrate Judge

Dated: March 25, 2010.